COURT OF APPEALS
DECISION
DATED AND FILED

February 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP51**

STATE OF WISCONSIN

Cir. Ct. No. 2021CV238

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN EX REL. DOUGLAS OITZINGER,

PLAINTIFF-APPELLANT-CROSS-RESPONDENT,

V.

CITY OF MARINETTE AND MARINETTE COMMON COUNCIL,

DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.

---

APPEAL from a judgment of the circuit court for Marinette County: JAY N. CONLEY, Judge. *Affirmed in part; reversed in part and cause remanded with directions.*

Before Stark, P.J., Hruz and Gill, JJ.

¶1      STARK, P.J.   The City of Marinette discovered PFAS in its water supply.[1]  It is undisputed that Tyco Fire Products LP, which is now a subsidiary of Johnson Controls, Inc. (collectively, Tyco), was responsible for introducing the PFAS into Marinette's groundwater.  As a result, Marinette's Common Council (the Council)[2] discussed issues regarding PFAS at several Council meetings.  The specific issue in this case is whether the Council violated Wisconsin's Open Meetings Law by entering into closed sessions on October 6 and 7, 2020, to discuss two issues related to the PFAS problem.

¶2      Marinette and the Council appeal and Douglas Oitzinger[3] cross-appeals from the circuit court's summary judgment decision dismissing Oitzinger's complaint alleging that the Council's October 6, 2020 meeting violated Wisconsin's Open Meetings Law, granting judgment against Marinette and the Council because the October 7, 2020 meeting was held in violation of the Open Meetings Law, and denying Oitzinger's request for attorney fees.  Based on this court's prior decision in *State ex rel. Citizens for Responsible Development v. City of Milton*, 2007 WI App 114, 300 Wis. 2d 649, 731 N.W.2d 640, and our determination that the plain language of the Open Meetings Law's exemption in

---

[1] Per- and polyfluoroalkyl substances (PFAS) "are widely used, long lasting chemicals, components of which break down very slowly over time."  U.S. ENVIRONMENTAL PROTECTION AGENCY, *PFAS Explained*, https://www.epa.gov/pfas/pfas-explained (last visited Feb. 7, 2025).  "Scientific studies have shown that exposure to some PFAS in the environment may be linked to harmful health effects in humans and animals."  *Id.*

[2] The Council is the governing body of the City of Marinette and is made up of nine members.

[3] Oitzinger is a citizen of Marinette and a Council member.  His official title on the Council is alderperson.  Oitzinger was serving on the Council at the time of the closed sessions.

WIS. STAT. § 19.85(1)(e) (2021-22)[4] does not apply, we conclude that the Council violated the Open Meetings Law by going into closed session on October 6 and 7, 2020. Accordingly, as the prevailing party, we conclude that Oitzinger is entitled to his reasonable attorney fees for privately enforcing the Open Meetings Law.

¶3 Therefore, we affirm the circuit court's judgment in part, reverse the judgment in part, and remand this case to the circuit court to determine Oitzinger's reasonable attorney fees award.

## BACKGROUND

¶4 The factual background of this case is largely undisputed. Tyco owned a Fire Technology Center (FTC) located in Marinette. The FTC was a multi-function facility containing research, testing, and training facilities for firefighting technologies. According to the record, "[f]or a significant period of time, the [FTC] flushed its firefighting foam down Marinette's sanitary sewers and into the [w]astewater [t]reatment [p]lant. It also discharged its firefighting foam into the surrounding outdoor environment[,] letting it seep into the soil." As a result, in 2017, it became apparent that PFAS had permeated the ground and the groundwater.

¶5 Two issues relevant to this case developed as a result of Tyco's conduct. First, PFAS contaminated Marinette's wastewater biosolids, which are

---

[4] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

formed as part of the wastewater treatment process.[5]  Before learning of the PFAS contamination, Marinette would dispose of the biosolids by spreading them on agricultural fields as manure.  However, in September 2018, the Wisconsin Department of Natural Resources (DNR) requested that Marinette stop spreading those biosolids.  As a result, Marinette began storing the contaminated biosolids in a holding tank.  The DNR later asked Marinette to safely dispose of the biosolids, leaving Marinette to determine how to do so safely and economically.

¶6      Second, PFAS contaminated well water to an unsafe level in the neighboring Town of Peshtigo.  In January 2018, the DNR sent Tyco a "responsible party letter" identifying Tyco's responsibility for the PFAS and directing Tyco to produce a remedial action options report in conformity with WIS. ADMIN. CODE § NR 722.13 (Nov. 2024).  Tyco hired an engineering consultant to create the "Remedial Actions Options Report for Long-Term Drinking Water Supply, Town of Peshtigo, Wisconsin" (hereinafter, the RAOR).  The RAOR identified and examined eight "long-term drinking water supply alternatives" it deemed to be "potentially feasible options for the residences with affected private water supply wells within the Town of Peshtigo."  The RAOR

---

[5] "When domestic sewage is transported and conveyed to a wastewater treatment plant …, it is treated to separate liquids from the solids, which produces a semi-solid, nutrient-rich product known as sewage sludge.  The terms 'biosolids' and 'sewage sludge' are often used interchangeably by the public; however, the U.S. Environmental Protection Agency [(EPA)] typically uses the term 'biosolids' to mean sewage sludge that has been treated to meet the [EPA's] requirements … to be applied to land as a soil conditioner or fertilizer."  U.S. ENVIRONMENTAL PROTECTION AGENCY, *Basic Information about Sewage Sludge and Biosolids*, https://www.epa.gov/biosolids/basic-information-about-sewage-sludge-and-biosolids (last visited Feb. 7, 2025).

ultimately recommended that the affected residences in Peshtigo be connected "to the City of Marinette public water system."[6]

¶7 As a result of the PFAS problem, Marinette reached two reimbursement agreements with Tyco. Under the first agreement, Tyco would pay the costs to partially dehydrate the biosolids that Marinette was currently storing (to reduce their volume) and ship them to a landfill in the state of Oregon. The second agreement obligated Tyco to give Marinette $75,000 toward "fees relate[d] to professional services rendered by attorneys and an environmental consultant" to research "providing water service to those [Peshtigo] residents" affected by the PFAS contamination "from the perspective of" Marinette. The Council had previously retained Attorney Paul Kent as "outside counsel for PFAS [w]ater issues."

¶8 Meanwhile, Marinette continued to seek a long-term and more cost-effective solution for the biosolids. Its solution included purchasing equipment that would reduce the biosolids' disposal costs by drying them out to substantially lower their volume prior to transporting them. Marinette asked Tyco to pay for this equipment, and this request became the impetus for, what Marinette calls, the "donation agreement" at issue during the October 6, 2020 meeting (hereinafter, October 6 meeting).

¶9 For approximately four months, Kent negotiated the donation agreement with Tyco. Marinette's mayor and utilities operations manager

---

[6] The details of the RAOR are not relevant to this appeal, except that alternative one suggested expansion of Marinette's water system to include the relevant Peshtigo service area and alternative two suggested that Marinette provide wholesale water service to Peshtigo.

provided input for the negotiations, and they saw all the drafts of the donation agreement. It appears undisputed, however, that the Council never directly participated in these negotiations, although at least a few Council members knew that the negotiations were occurring; the Council never saw the drafts; and the Council was not included in discussions with Kent.

¶10 On October 5, 2020, public notice of the October 6 meeting was posted. After consulting with Marinette's attorneys, the mayor decided to provide notice of a closed session for the portion of the meeting discussing the donation agreement. According to his deposition testimony, he did so in order to protect Marinette's bargaining position by avoiding public discussion of the donation agreement's terms and compromising Marinette's ability to further negotiate any additional terms the Council requested. The notice included a closed session agenda item, pursuant to WIS. STAT. § 19.85(1)(e), that stated as follows: "negotiations and review of an agreement with … Tyco regarding bio-solid equipment" and "[p]ursuant to … § 19.85(2), the Common Council may reconvene in open session immediately after conclusion of the closed session to take action, if any, on any closed session agenda item."

¶11 Based on the minutes of the October 6 meeting, no discussion of the donation agreement occurred on the record before the Council immediately voted to convene in closed session. At the beginning of the closed session, the Council members were provided with copies of the donation agreement, and it is undisputed that this was the first time the Council members were shown a copy of the agreement. During the closed session, the utilities operations manager explained that due to the continuing PFAS contamination of the biosolids, Marinette would need to continue disposing of the biosolids in a landfill rather than spreading them on agricultural fields. The utilities operations manager

detailed the proposed equipment purchase, the process of drying the biosolids, and why that process was necessary (because it would reduce the expense of shipping the biosolids). Kent then explained the terms of the donation agreement to the Council.

¶12    Oitzinger averred in his affidavit that he "asked how much added expense there would be for shipping out the dried biosolids compared to Marinette's previous expenses for spreading the biosolids on fields," and "[the utilities operations manager] answered that they were budgeting an extra $20,000" annually. Oitzinger also stated that he "questioned additional ongoing costs of operating and maintaining the equipment, to which the [utilities operations manager] responded that he was not sure how much more it would be." And, according to Oitzinger, when he "suggested that Marinette should ask for more money [from Tyco] to cover those increased ongoing costs, Kent responded that they had finished negotiating and they believed this was the best deal they could get." One other Council member also raised concerns about whether the donation agreement prevented Marinette from coming back in the future for additional funds or taking further action related to the biosolids.

¶13    The Council then returned to open session and, without any discussion of the donation agreement, voted eight-to-one (Oitzinger dissenting) to approve the donation agreement. The donation agreement was fully executed on November 3, 2020.

¶14    Around the same time the donation agreement was being negotiated, the Council retained Ruekert & Mielke, Inc. (hereinafter, R/M) to independently analyze the RAOR alternatives "and identify operational, financial, and legal challenges associated with each alternative from [Marinette's] standpoint." R/M's

analysis was to proceed in two phases: (1) R/M would evaluate the RAOR alternatives with respect to their impact on Marinette but would not make any recommendations; and (2) R/M "would take a closer look at the operational, technical[,] and legal aspects of … Marinette providing water service to" Peshtigo. Phase two would only occur if the result of phase one was that the best solution was for Marinette to provide water to Peshtigo.

¶15    On July 9, 2020, R/M provided Kent with its phase one draft memo (hereinafter, the R/M Memo), but the R/M Memo was never provided to the mayor or the Council.[7]    Again, after consulting with Marinette's attorneys, the mayor determined that the R/M Memo should be discussed in closed session during the Council's October 7, 2020 meeting (the October 7 meeting).  According to the mayor's deposition testimony, he reasoned that a closed session would be "appropriate based on the … negotiations that were ongoing" because "Tyco had a vested interest in what option is most economical for them, the town had their own interest, the City of Peshtigo had some involvement with prior reports, and [Marinette] had [its] own concern and interests, and it all came down to money."

¶16    On October 6, 2020, public notice of the October 7 meeting was posted.  That notice announced that the Council would conduct a "discussion with legal counsel regarding the status of [the] water supply alternative analysis." According to the minutes, when the October 7 meeting began, the Council moved immediately after role call to convene in closed session without any discussion on the record.  Once the Council convened in closed session, the record reveals that the mayor gave a brief introduction and "set the context" of the meeting, and Kent

---

[7]  The contents of the R/M Memo are not relevant to the issues on appeal.

and the R/M representative then presented the phase one analysis, including "a synopsis of the technical and water quality issues along with the economic and political issues." According to the R/M representative's deposition:

> [Kent] talked about [what] the focus of the study w[as], to look at the conclusions of the [RAOR], were they reasonable, were there any other items from the [RAOR] that were missing, for example, items such as fire protection and water quality, and then how the report, you know, talked about implications … for [Marinette] associated with the alternatives or what the implications for the city were for the alternatives.
>
> And then [the R/M representative] followed up with taking a deeper look at each of the alternatives one by one.

¶17    The R/M representative stated that Kent also "raised some liability issues" surrounding Marinette providing water to Peshtigo, but Kent's discussion "wasn't a legal analysis." Both presentations were interactive, with the Council members asking Kent and the R/M representative questions. Oitzinger explained at his deposition that this was a "very high-level kind of summary type of discussion. [We w]eren't digging down very deep at that point." Based on the record, the R/M representative did not discuss what R/M thought was the best way to provide water to Peshtigo. Ultimately, the Council voted unanimously to adjourn the meeting without taking any further action.

¶18    Pursuant to WIS. STAT. § 19.97(1), Oitzinger filed a verified complaint with the Marinette County District Attorney, alleging that the October 6 and 7 closed sessions were illegal. The district attorney declined to prosecute the alleged violations. *See* § 19.97(4).

¶19    Oitzinger, acting on "his … relation in the name, and on behalf, of" the State of Wisconsin pursuant to WIS. STAT. § 19.97(4), then filed this action

against Marinette and the Council. Thereafter, the parties filed cross-motions for summary judgment.

¶20 After a nonevidentiary hearing, the circuit court issued a written decision granting in part and denying in part the parties' motions. The court found no genuine issues of material fact. As to the October 6 meeting, the court reasoned that the donation agreement involved ongoing negotiations and because "the Council had not seen the document, no one could predict their reaction to it; they could have found it unacceptable and wanted more money, or different terms and conditions." Thus, the court concluded that it was proper to discuss the donation agreement in closed session. In terms of the October 7 meeting, the court reached the opposite conclusion. According to the court, providing water to Peshtigo "was a potential problem for [Marinette] in the future, but there were no negotiations or bargaining position to protect at the time of the meeting."

¶21 The circuit court also declined to award attorney fees to Oitzinger, stating only that "[t]he [c]ourt is not going to award attorney fees or costs to either side given the split [d]ecision." The court dismissed Oitzinger's complaint as to the October 6 meeting and granted judgment against Marinette as to the October 7 meeting. Oitzinger appeals; Marinette cross-appeals.[8]

---

[8] We held oral argument in this case on January 7, 2025. The Wisconsin Freedom of Information Council, the Wisconsin Newspaper Association, the Wisconsin Broadcasters Association, and the Society of Professional Journalists all filed a collective amicus brief in this case. Counsel for the amici also attended oral argument and made a short statement.

## DISCUSSION

*I. WISCONSIN STAT. § 19.85(1)(e)*

¶22 Wisconsin's Open Meetings Law is designed to ensure transparency and accountability to the electorate by providing the public with the right to attend meetings of governmental bodies so the public may have "the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business." WIS. STAT. § 19.81(1). Further, "[t]o implement and ensure th[is] public policy," the law provides the unmistakable directive that "*all* meetings of *all* state and local governmental bodies *shall* be publicly held in places reasonably accessible to members of the public and *shall* be open to all citizens *at all times* unless otherwise *expressly* provided by law." Sec. 19.81(2) (emphasis added). Importantly, we are to "liberally construe[]" this directive "to achieve the purposes set forth in this section." Sec. 19.81(4).

¶23 WISCONSIN STAT. § 19.83(1) directs that "[e]very meeting of a governmental body shall be preceded by public notice as provided in [WIS. STAT. §] 19.84, and *shall be held in open* session." (Emphasis added.) This subsection further explains that "all discussion shall be held and all action of any kind, formal or informal, shall be initiated, deliberated upon and acted upon only in open session except as provided in [WIS. STAT. §] 19.85." Sec. 19.83(1). However, the Open Meetings Law also contains eleven exemptions to the general rule that all meetings are to remain open. Sec. 19.85 (1)(a)-(h). Our supreme court has stated that courts should strictly construe these exemptions. ***State ex rel. Hodge v. Town of Turtle Lake***, 180 Wis. 2d 62, 71, 508 N.W.2d 603 (1993).

¶24 The parties agree that the exemption at issue in this case is WIS. STAT. § 19.85(1)(e), which provides that "[a] closed session may be held

for … the following purpose[]": "Deliberating or negotiating the purchasing of public properties, the investing of public funds, or conducting other specified public business, *whenever competitive or bargaining reasons require a closed session*."[9]  (Emphasis added.)  For ease of reading, we will at times refer to WIS. STAT. § 19.85(1)(e) in this decision as "the bargaining exemption."  Our role is to interpret the bargaining exemption and apply it to the circumstances of this case.  Given that the parties do not dispute the material facts, only questions of law are before us on appeal, which we review de novo.  *See Milton*, 300 Wis. 2d 649, ¶5.

¶25    In this case, the circuit court granted partial summary judgment to each of the parties.  Appellate courts "review a grant or denial of summary judgment independently, applying the same standard employed by the [circuit court], while benefitting from [its] discussions."  *Westmas v. Creekside Tree Serv., Inc.*, 2018 WI 12, ¶16, 379 Wis. 2d 471, 907 N.W.2d 68.  "Summary judgment is appropriate only when there is no genuine dispute of material fact and the moving party has established his or her right to judgment as a matter of law."  *Id.*; *see also* WIS. STAT. § 802.08(2).

¶26    This court previously had occasion to determine the meaning of the bargaining exemption in *Milton*, and we therefore begin with the foundation that has already been laid for us in that case.  There, the City of Milton held ten closed meetings concerning United Cooperative, L.L.C.'s (hereinafter, United Coop) interest in building an ethanol plant in the city.  *Milton*, 300 Wis. 2d 649, ¶2.  The minutes from the closed sessions reflected that the following items were

---

[9]  The parties further confirmed at oral argument that the relevant provision of WIS. STAT. § 19.85(1)(e) is "conducting other specified public business."

discussed: negotiations to build the plant and purchase land, possible problems associated with having an ethanol plant in the community, and other possible projects for Milton's industrial park. *Id.* "At the final meeting, Milton approved a [d]eveloper's [a]greement between Milton and United Coop." *Id.* After these plans became public, the plaintiff brought an action alleging a violation of the Open Meetings Law. *Id.*, ¶3. The parties filed cross-motions for summary judgment, and the circuit court granted summary judgment to Milton. *Id.*

¶27 Ultimately, the *Milton* court concluded "that the reasons Milton articulated for closing the entirety of its meetings regarding the proposed ethanol plant do not satisfy the requirements under WIS. STAT. § 19.85(1)(e)," and, therefore, "Milton's competitive or bargaining reasons did not require closed sessions for the entirety of its meetings discussing the proposed ethanol plant." *Milton*, 300 Wis. 2d 649, ¶12. We began our analysis by citing *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 151 Wis. 2d 608, 445 N.W.2d 689 (Ct. App. 1989), for the proposition that "the burden is on the governmental body to show that competitive or bargaining interests require closed sessions under … § 19.85(1)(e)." *Milton*, 300 Wis. 2d 649, ¶¶9-10. Citing *Pleva*, we further explained that "[m]erely stating that the meetings would involve competitive or bargaining issues is a blanket approach in closing such … sessions." *Milton*, 300 Wis. 2d 649, ¶9 (alteration in original; citation omitted). Rather than employing such a blanket approach, we stated that the record should "reflect the [governmental body's] basis for determining that their meetings fell within the exemption delineated in [§] 19.85(1)(e)." *Milton*, 300 Wis. 2d 649, ¶9 (citation omitted).

¶28 As relevant to the issues here, we next considered the definition of the word "require" in WIS. STAT. § 19.85(1)(e). *Milton*, 300 Wis. 2d 649, ¶14.

We acknowledged that the word was not defined under the statutes, and we therefore applied the "common definition." *Id.*; *see also* **State ex rel. Kalal v. Circuit Ct. for Dane Cnty.**, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. According to this court, "'Require' is defined as: 'To have as a requisite: NEED'; 'To call for as appropriate: DEMAND'; 'To impose an obligation on: COMPEL'; and 'To command: order.'" **Milton**, 300 Wis. 2d 649, ¶14 (citation omitted). Accordingly, we explained that "[t]he legislature's choice of the word 'require' … connotes its intent to limit the ex[em]ption under § 19.85(1)(e) to those situations where the government's competitive or bargaining reasons leave no other option than to close meetings." **Milton**, 300 Wis. 2d 649, ¶14. Thus, we explained that "a government may have a valid reason for *desiring* to close its meetings that nevertheless fails to establish closed meetings are *required*." **Id.**

¶29 We then addressed the parties' specific arguments. In particular, we addressed Milton's argument "that it was allowed to close all meetings concerning the ethanol plant for fear of losing United Coop to another municipality." **Id.**, ¶15. We noted, however, that "[t]here is no indication that holding closed meetings deterred United Coop from seeking a better financial package from some other municipality." **Id.** Similarly, Milton's asserted interest in keeping negotiations to purchase land secret also did not justify its closed meetings. **Id.**, ¶16. According to this court, "[p]ossible competition … did not justify closed meetings." **Id.** We went on to explain that "even if secrecy somehow deterred competition from other municipalities," it was "not apparent that such a reason would support holding closed meetings." **Id.**, ¶17. We further explained that "[p]ermitting the governed to express opinions about prospective purchases may be time consuming, frustrating, counterproductive and might increase costs. But the Wisconsin legislature has decided that complete information regarding the affairs of

14

government is the policy of Wisconsin." *Id.* Saving costs alone does not justify "closing the door to public scrutiny." *Id.*

¶30 We also were not persuaded by Milton's argument that it included contingencies in the final approval of the ethanol plant development to allow for public input. *Id.*, ¶18. We explained that there was no statutory provision allowing the city to overcome the requirements of WIS. STAT. § 19.85(1) by including the opportunity for future public input. *Milton*, 300 Wis. 2d 649, ¶18.

¶31 Finally, we stated that revealing a negotiation strategy could qualify under WIS. STAT. § 19.85(1)(e). As we explained,

> Developing a negotiation strategy or deciding on a price to offer for a piece of land is an example of what is contemplated by "whenever competitive or bargaining reasons require a closed session." However, just because those concerns were present for portions of some of the meetings does not mean the entirety of the meetings fell within the narrow ex[em]ption under § 19.85(1)(e).

*Milton*, 300 Wis. 2d 649, ¶19. Accordingly, we determined that Milton was not "justified in closing *all* parts of *all* meetings concerning the proposed ethanol plant based on the reasons it ha[d] asserted." *Id.*

¶32 We are bound by this court's decision in *Milton*. *See Cook v. Cook*, 208 Wis. 2d 166, 185-90, 560 N.W.2d 246 (1997) (the court of appeals is bound by published decisions of the court of appeals). As noted above, the *Milton* court interpreted the meaning of the word "require" as used in the bargaining exemption and determined that it was intended "to limit the ex[em]ption … to those situations where the government's competitive or bargaining reasons *leave no other option than to close meetings*." *Milton*, 300 Wis. 2d 649, ¶14 (emphasis added). We are

bound by this definition, and it is the standard that we must apply to the facts of this case.

¶33     The parties do not question the meaning of the remainder of the terms in the bargaining exemption.  Further, the parties opined at oral argument that the bargaining exemption is not ambiguous, and we agree.  Using the accepted dictionary meanings of the words "whenever," "competitive," and "bargaining,"[10] we conclude that the plain language of the text at issue in this case provides that a closed session may be held to conduct other specified public business at any or every time that negotiating the terms of a contract or transaction is involved, including competing for more favorable terms, such that those circumstances leave no other option than to close the meeting.

¶34     The implication of the bargaining exemption is that the closed session must be necessary to protect the public's competitive or bargaining interests.  Further, the *Milton* court's decision, as well as the fact that WIS. STAT.

---

[10] "Whenever" is defined as "at any or every time that," which is a very broad definition suggesting no limitation.  *Whenever*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/whenever (last visited Feb. 7, 2025); *see also* **State v. Boyd**, 2012 WI App 39, ¶7 n.2, 340 Wis. 2d 168, 811 N.W.2d 853 (defining "[w]henever" as "at any or all times" or "in any or every instance").  "Competitive" is defined as "relating to, characterized by, or based on competition," *Competitive*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/competitive (last visited Feb. 7, 2025), and "competition" is defined as "the act or process of competing: RIVALRY: such as" "the effort of two or more parties acting independently to secure the business of a third party by offering the most favorable terms," *Competition*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/competition (last visited Feb. 7, 2025); *see also Competitive Advantage*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The potential benefit from information, ideas, or devices that, if kept secret by a business, might be economically exploited to improve the business's market share or to increase its income.").  "Bargaining," in contrast, is defined as "[d]iscussion for the purpose of reaching an agreement about a contract, sale, deal, etc.; [specifically], the process of negotiating the terms of a contract or transaction." *Bargaining*, BLACK'S LAW DICTIONARY (12th ed. 2024).

16

§ 19.85(1)(e) uses the term "required," illustrates that the language of the bargaining exemption does not support having a closed session where the competitive or bargaining reasons are speculative or merely helpful, rational, appropriate, or justified based on the government body's preference. *See **Milton***, 300 Wis. 2d 649, ¶16.

¶35    Furthermore, as relevant to this appeal, the Open Meetings Law contains two procedural requirements for closed sessions. First, WIS. STAT. § 19.84(1) provides that "[p]ublic notice of all meetings of a governmental body shall be given" "[b]y communication from the chief presiding officer of a governmental body or such person's designee to the public," and § 19.84(2) states that the public notice "shall set forth the time, date, place and subject matter of the meeting, including that intended for consideration at any contemplated closed session, in such form as is reasonably likely to apprise members of the public and the news media thereof."[11]

¶36    The second requirement is found in WIS. STAT. § 19.85(1), which provides:

> Any meeting of a governmental body, upon motion duly made and carried, may be convened in closed session under one or more of the exemptions provided in this section. The motion shall be carried by a majority vote in such manner that the vote of each member is ascertained and recorded in the minutes. No motion to convene in closed session may be adopted unless the chief presiding officer announces to those present at the meeting at which such motion is made, the nature of the business to be considered at such closed session, and the specific exemption or exemptions under this subsection by which such closed

---

[11] In this case, the record reflects that Marinette's mayor created the public notices. There is no dispute that the public notices for both the October 6 and the October 7 meetings complied with the terms of WIS. STAT. § 19.84; thus, we will not discuss the notices further.

17

> session is claimed to be authorized. Such announcement shall become part of the record of the meeting. No business may be taken up at any closed session except that which relates to matters contained in the chief presiding officer's announcement of the closed session.

¶37 Based on these requirements, we conclude that all meetings, and discussions at all meetings, must begin in open session. We reach this conclusion based, first, on the provisions of WIS. STAT. §§ 19.81(2) and 19.83(1), which unequivocally state that meetings of governmental bodies "shall" be held in open session. *See State v. Cox*, 2018 WI 67, ¶11, 382 Wis. 2d 338, 913 N.W.2d 780 ("The general rule is that the word 'shall' is presumed mandatory when it appears in a statute." (citation omitted)). For this reason, the default status is that governmental body meetings and all discussions at such meetings are open to the public. Further, the language of WIS. STAT. § 19.85(1) requires that the chief presiding officer announce "to those present *at the meeting* … the nature of the business to be considered at such closed session, and the specific exemption or exemptions under this subsection by which such closed session is claimed to be authorized." (Emphasis added.) The "announcement" becomes "part of the record of the meeting," and "no motion to convene in closed session may be adopted unless" that announcement occurs on the record. *Id.* Accordingly, if at least some discussion is not held on the record regarding a proposed closed session, the governmental body fails to comply with § 19.85(1).[12]

¶38 The *Milton* court's holding and the natural consequence of that decision also support our conclusion that all discussions must begin in open

---

[12] Our statement here is not intended to suggest or describe exactly what information must be provided during an open session to establish a basis for a governmental body's vote and a closed session. That issue is not before us, as no attempt was made to provide that information in open session in either of the meetings at issue.

session. In *Milton*, we reiterated that the burden was on the governmental body "*to show* that competitive or bargaining interests require closed sessions," and we specifically rejected a "blanket approach" to closing sessions. *Milton*, 300 Wis. 2d 649, ¶10 (emphasis added). Then, we limited the bargaining exemption "to those situations where the government's competitive or bargaining reasons leave no other option than to close meetings," and we clarified that "a valid reason for *desiring* to close" a meeting is not sufficient to "establish [that] closed meetings are *required*." *Id.*, ¶14. Lastly, the *Milton* court confirmed that even when there is a demonstrated "competitive or bargaining reason[] [to] require a closed session," that fact "does not mean the entirety of the meetings fell within the narrow ex[em]ption under [WIS. STAT. §] 19.85(1)(e)." *Id.*, ¶19. Thus, *Milton* contemplates and supports the idea that the governmental body must begin its discussions in an open session, place the initial discussion of the subject matter on the record, and clarify why a specific topic within that discussion requires a closed session prior to voting to go into closed session.

¶39 Marinette, in contrast, presents several challenges to our initial interpretation of the bargaining exemption. First, Marinette disputes Oitzinger's, and now our, assertion that we are bound by *Milton*. Marinette argued during oral argument that we are "not bound by [*Milton*'s] language" because we need not overrule, modify, or withdraw *Milton*'s holding, we need only "clarify and add to *Milton*." According to Marinette, the *Milton* court merely stated the dictionary definitions of "require," but then it failed to actually choose one of those definitions. Instead, Marinette claims that the "'no other option' [language] was intended as another way of stating the uncontroversial principle that 'requires' is not synonymous with 'desire.'" Marinette also faults the *Milton* decision for "not

19

delineat[ing] which portions of which meetings were properly closed" and for failing to "determine what qualifies as a 'competitive or bargaining' reason."[13]

¶40 We disagree with Marinette's above-stated position that *Milton*'s definition of "require" is not binding precedent. *Milton*'s use of the phrase "no other option," *see Milton*, 300 Wis. 2d 649, ¶14, was not, as Marinette argues, merely another way to say that "'requires' is not synonymous with 'desire.'" The "no other option" language was the court's answer to the meaning of the word "require." *Id.* We are not persuaded by Marinette's strained attempt to argue around the *Milton* court's statutory interpretation.

¶41 Relatedly, Marinette seeks to apply a different definition of "require" to the bargaining exemption than that determined by the *Milton* court. Marinette argues that

> "whenever competitive or bargaining reasons require a closed session" means something similar to "anytime a rational justification renders closed session sufficiently appropriate to be more compelling than a desire, provided the justification is not speculative and arises from either (1) competition with other entities seeking the same business or (2) bilateral discussions regarding the terms of an agreement affecting their relationship."

(hereinafter, the rational justification definition). Marinette also contends that the definition "'to call for as suitable or appropriate' … is the closest approximation of 'require' because it is easily harmonized with the … *Milton* formulation." It

---

[13] Marinette also argues that the language of the bargaining exemption has changed from "which for competitive or bargaining reasons require closed sessions" to "whenever competitive or bargaining reasons require a closed session." *Compare* WIS. STAT. § 14.90(3)(d) (1959-60) *and* WIS. STAT. § 66.77(4)(d) (1973-74) *with* WIS. STAT. § 19.85(1)(e) (1975-76); *see also* 1975 Wis. Act. 426 (July 1, 1976). However, Marinette does not explain how the different language would change the analysis. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not address undeveloped arguments).

also postulates that "[a] non[]mandatory construction" of the term "require" "is not unique, as other courts have interpreted 'require' as meaning something less than absolute necessity."

¶42 We cannot accept Marinette's alternative definitions. Although Marinette stated at oral argument that it was not asking us to overturn ***Milton***, asking us to apply a different definition to the word "require" would be, at best, a modification of ***Milton***, which is something we cannot do. *See **Wisconsin Voter All. v. Secord***, 2025 WI 2, ¶¶32-33, __ Wis. 2d __, __ N.W.3d __ (citing ***Cook***, 208 Wis. 2d at 190). Regardless, we believe the ***Milton*** court applied an appropriate definition, given the plain language and stated statutory purpose. The ***Milton*** court considered a spectrum of definitions of the word "require." ***Milton***, 300 Wis. 2d 649, ¶14. The court could have chosen, as Marinette advocates, the broadest or the most permissive definition of the word, but the court appropriately chose the most restrictive definition. *See id.*; *see also **Hodge***, 180 Wis. 2d at 71.

¶43 In terms of Marinette's proposed rational justification definition, we note that when asked about this definition at oral argument, Marinette did not appear to continue to support that theory, advocating instead for another theory. *See infra* ¶44. Regardless, Marinette's rational justification definition includes terms not found in the bargaining exemption, and if we were to accept that reading, we would be impermissibly adding words to the statute that the legislature did not see fit to include. *See, e.g.*, ***Fond Du Lac County v. Town of Rosendale***, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989) ("One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning." (citation omitted)); *see also **State v. Wiedmeyer***, 2016 WI App 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805 ("It is not up to the courts to rewrite the plain words of statutes ….").

¶44    Instead of the rational justification definition, Marinette advocated at oral argument, and for the first time on appeal, for "a multifactor test for objective reasonableness."    According to Marinette, those factors would include the following: (1) what was to be discussed at the meeting; (2) what was at stake; (3) did the governmental body wish to confer with legal counsel; (4) what did the governmental body know at the time the closed session was noticed and convened; (5) were there identifiable competitive or bargaining concerns or were there identifiable parties on the sidelines; (6) was the decision to notice a closed session made by an elected official; (7) were negotiations active, reasonably anticipated, or merely possible; and (8) a rebuttable presumption of good faith.  According to Marinette, its proposed test is appropriate because "this is the kind of test that was adopted in" *State ex rel. Buswell v. Tomah Area School District*, 2007 WI 71, 301 Wis. 2d 178, 732 N.W.2d 804.

¶45    We reject Marinette's suggestion that we adopt a reasonableness test for WIS. STAT. § 19.85(1)(e).  Initially, given that Marinette failed to raise this argument until oral argument, we could refuse to reach the issue based on the forfeiture rule.  *See* *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998).  Nevertheless, we will address Marinette's assertion.  Marinette's primary impetus for advocating for a reasonableness test is its belief that the bargaining exemption represents an inherent exercise of discretion—a point that Oitzinger does not dispute.  We also agree that the bargaining exemption represents an exercise of discretion: a governmental entity must determine whether, under the particular circumstances, a closed session is

22

required, meaning that there is no other option.[14]  However, the governmental entity's use of a multi-factor reasonableness test in the exercise of its discretion is unsupported by the statutory text.

¶46    For that reason, Marinette's citation to *Buswell* is unavailing.  In *Buswell*, our supreme court determined "that the plain meaning of WIS. STAT. § 19.84(2) [(2003-04)] sets forth a reasonableness standard."  *Buswell*, 301 Wis. 2d 178, ¶3.  Importantly, § 19.84(2) provides, in relevant part, that "[e]very public notice of a meeting of a governmental body shall set forth the time, date, place and subject matter of the meeting … in such form as is *reasonably* likely to apprise members of the public and the news media thereof."  (Emphasis added.)  As the court explained, "The use of the word 'reasonably' suggests a balancing of factors."  *Buswell*, 301 Wis. 2d 178, ¶22.  The bargaining exemption, in contrast, does not contain the word "reasonably," *see* WIS. STAT. § 19.85(1)(e), and, therefore, a reasonableness test is unsupported.

¶47    Finally, Marinette relies heavily on *Friends of Frame Park, U.A. v. City of Waukesha*, 2022 WI 57, 403 Wis. 2d 1, 976 N.W.2d 263, in support of its position that the Council properly applied the bargaining exemption.[15]  In *Friends*

---

[14] WISCONSIN STAT. § 19.85(1) also provides that a meeting "may be convened" and "may be held" in closed session under one or more of the enumerated exemptions.  "The use of the word 'may' in a statute implies discretionary authority."  *Liberty Grove Town Bd. v. Door Cnty. Bd. of Supervisors*, 2005 WI App 166, ¶10, 284 Wis. 2d 814, 702 N.W.2d 33.  In other words, even if the statutory requirements for conducting a closed meeting are met, a governmental body may still opt to hold that meeting in an open session.

[15] Marinette also argues that its case is analogous to *State ex rel. Herro v. Village of McFarland*, 2007 WI App 172, 303 Wis. 2d 749, 737 N.W.2d 55.  In that case, the Village of McFarland and the Town of Dunn were accused of violating the Open Meetings Law when their joint committee created an agreement in a closed meeting.  *Id.*, ¶1.  The town was in negotiations with property owners to purchase their properties, and the town was concerned that if the property owners knew the concessions the town was willing to make to the village, they would stop negotiating with the town and begin negotiating with the village instead.  *Id.*, ¶4.

(continued)

*of Frame Park*, the plaintiff requested that the City of Waukesha release certain records under Wisconsin's Public Records Law relating to the city's plans to bring amateur baseball to Frame Park. *Id.*, ¶¶5-7. The city released all requested documents, except a draft contract. *Id.*, ¶6. The city said it withheld the contract to protect the city's "negotiating and bargaining position," pursuant to WIS. STAT. § 19.85(1)(e), until the common council had acted on the contract. *Friends of Frame Park*, 403 Wis. 2d 1, ¶6. The plaintiff responded with an action under WIS. STAT. § 19.37(1), seeking release of the draft contract as well as attorney fees and other expenses. *Frame Park*, 403 Wis. 2d 1, ¶7. The city eventually released the draft contract after a common council meeting, and the plaintiff amended its complaint to seek an order stating that the draft contract was improperly withheld. *Id.*, ¶¶6-9.

¶48 Our supreme court released a divided opinion in the case. Justice Brian Hagedorn authored the lead opinion, which reached a majority conclusion on the issue of attorney fees. *Id.*, ¶3. The court was not able to reach a majority on the issue of "whether the [c]ity properly withheld the draft contract until after the [c]ommon [c]ouncil meeting," as Justice Rebecca Bradley's concurrence argued that the issue was moot. *Id.*, ¶¶12, 43 (R. G. Bradley, J., concurring).

¶49 Nevertheless, Marinette argued at oral argument that the lead opinion and the dissent in *Friends of Frame Park* supported its position that

---

We conclude that this case is materially distinguishable from *Herro* on its facts because the *Herro* court never analyzed whether the town had a competitive or bargaining reason that required a closed session. This court assumed the reason existed, ruling that "[i]t is … not inconsistent with the open meetings law for a body to move into closed session under WIS. STAT. § 19.85(1)(e) when the bargaining position to be protected is not shared by every member of the body," without determining whether protection of the bargaining position was required. *Herro*, 303 Wis. 2d 749, ¶17. *Herro* does not help Marinette's position.

*Milton*'s "no other option" language is too "narrow." According to Marinette's reading of the decision, Justice Hagedorn's lead opinion suggested that the common council members' "initial reactions [and] initial discussions to a proposal justify a closed session." We disagree with Marinette's proposition.

¶50 First, *Friends of Frame Park* did not overrule *Milton*. Instead, the lead opinion positively cited *Milton* in support of the proposition that "[i]t is not uncommon for the state or local municipalities to negotiate certain contracts in private, especially in competitive business environments." *Friends of Frame Park*, 403 Wis. 2d 1, ¶33. Second, *Friends of Frame Park* was a Public Records Law case, not an Open Meetings Law case. Further, there was no majority opinion on the issue of whether the draft contract was properly withheld. Therefore, at best, *Friends of Frame Park* qualifies as persuasive authority.

¶51 Third, we do not read *Friends of Frame Park* like Marinette. The lead opinion clearly supported the idea that while "[t]here is good reason for the public to know how government spends public money," "contract negotiation often requires a different calculus."[16] *Id.*, ¶33. We agree that different

---

[16] Justice Jill Karofsky's dissent, which Marinette references, explained:

> [T]he City argues that the Council's reactions to the proposed contract terms would weaken its ability to further negotiate terms with Big Top. But if the City wanted to hide the Common Council's reactions to proposed contract terms, the solution was to have the Common Council go into a closed session, not withhold disclosure of the proposed contract Big Top had already seen and red-lined. In short, no qualifying competitive or bargaining concerns regarding the proposed contract exist in the record.

(continued)

25

circumstances may require different levels of secrecy to protect a competitive or bargaining position, especially when contract negotiation is involved. Our conclusion in this case states (we think, uncontroversially) that the plain language of the statute requires that the decision to enter into closed session be made with actual knowledge of the circumstances and the interests requiring secrecy. Under *Milton* and *Friends of Frame Park*, negotiating the terms of a contract is well within the boundaries of the bargaining exemption, but nothing in *Friends of Frame Park* overturns *Milton*'s holding that "just because [competitive or bargaining] concerns were present for portions of some of the meetings does not mean the entirety of the meetings fell within the narrow ex[em]ption under [WIS. STAT.] § 19.85(1)(e)."[17] *See Milton*, 300 Wis. 2d 649, ¶19.

## II. October 6 meeting

¶52 Now that we have determined the meaning of the bargaining exemption, the next question is whether Marinette met its burden of proving that competitive or bargaining interests required a closed session at the October 6 meeting. *See Milton*, 300 Wis. 2d 649, ¶10. Based on our review of the

---

*Friends of Frame Park, U.A. v. City of Waukesha*, 2022 WI 57, ¶134, 403 Wis. 2d 1, 976 N.W.2d 263 (Karofsky, J., dissenting). The dissent did not specifically analyze the bargaining exemption under this hypothetical scenario. Regardless, we do not agree that this discussion supports Marinette's argument that the possibility that a discussion may invoke "reactions" *always* justifies a closed session.

[17] We pause here briefly to note that the amici "urge [us] to reject Marinette's attempt to greatly expand the [b]argaining ex[em]ption to Wisconsin's Open Meetings Law." We agree with their contention that the Open Meetings Law supports "[r]obust access to government information [which] promotes democracy, and courts must strictly construe any limitation upon that access. When deliberations occur in public view, it also puts pressure on officials to act ethically, justify their positions, and be accountable to those they serve."

circumstances in this case, we conclude that Marinette failed to comply with the provisions of the Open Meetings Law.

¶53    As noted above, the circuit court concluded that the bargaining exemption "fits the facts of the" October 6 meeting because the "Council saw the proposed donation agreement for the first time" and "had a chance to discuss it with legal counsel and voice their concerns and objections, including the amount of Tyco's donation."  According to the court, "no one could predict [the Council's] reaction to [the donation agreement]; they could have found it unacceptable and wanted more money, or different terms and conditions." Relying on ***Friends of Frame Park*** for persuasive authority, the court found that our supreme court's logic in that case "applie[d] here":  "Defendants had a right to vet this agreement in closed session with counsel without the other party, Tyco, there."  Further, the court explained that "the donation agreement was not final or binding until the Council approved it in open session," *see* WIS. STAT. § 62.11(5) (the common council has the power to act on behalf of the city), and it was "proper to discuss [the donation agreement] in closed session" because Tyco representatives were present at the October 6 meeting.

¶54    We conclude that the circuit court erred by determining that the October 6 meeting's discussion was properly held entirely in closed session.  First, the October 6 meeting's discussion of the donation agreement did not begin in open session, in violation of the law.  Based on our review of the minutes, the October 6 meeting involved several agenda items.  While the October 6 meeting itself began in open session, it does not appear that the discussion of the donation agreement began, or was at least introduced, in open session, meaning that no discussion of the reasons for going into closed session occurred before the Council immediately voted to convene in closed session.  This omission is important

because it is undisputed that the Council had never seen a draft of the donation agreement and had no idea about the terms of that contract. Thus, the Council had no basis to conclude that a closed session was "require[d]" or to ascertain whether "the nature of the business to be considered" qualified "under one or more of the exemptions provided" in WIS. STAT. § 19.85(1)(a)-(h). As this court made clear in *Milton*, the governing body must establish a clear record of the nature of the items to be discussed to justify a vote to enter into a closed session. *Milton*, 300 Wis. 2d 649, ¶9 (citing *Pleva*, 151 Wis. 2d at 616).

¶55 Moreover, the information that the Council *was* aware of at the time it voted to convene in closed session failed to meet the standard of the bargaining exemption. Again, the Council lacked any information beyond what the mayor had provided in the meeting notice: "negotiations and review of an agreement with … Tyco regarding bio-solid equipment." Without at least a general overview of the substance of the donation agreement and the status of the donation agreement negotiations, the Council was unable to properly determine whether "competitive or bargaining reasons require[d] a closed session," *see* WIS. STAT. § 19.85(1)(e), such that those "reasons [left] no other option than to" convene in closed session, *see Milton*, 300 Wis. 2d 649, ¶14.

¶56 To that point, we agree with the reasoning of Oitzinger's arguments on appeal. He makes the following points:

> Marinette was not in a position where it had "no other option" but to hold its meeting secretly. The Council could have explained the background of the problem in open session—Tyco was aware of the problem. They could have explained the terms of the agreement in open session—Tyco was aware of those terms. They could have explained how the equipment worked in open session—that would not harm their bargaining position. They could have discussed their increased disposal costs in open session—Tyco was aware of those, having previously paid for

> disposal of the first load of contaminated biosolids in Oregon.
>
> …. The Council could have discussed the proposal in open session and if somebody suggested making a counter[]offer, *then* gone into closed session to develop a negotiation strategy. The only significant difference between *Milton* and this case was that *Milton did* discuss its negotiation strategies, and those discussions were properly held in closed session. The … Council never discussed a negotiation strategy, so none of its discussions were appropriate for closed session.

¶57 Even if the mayor and Kent had presented to the Council what *they* knew and why *they* believed that a closed session was required, the specific facts of this case reveal the fallacy of their belief. Prior to the October 6 meeting, the mayor and Kent both knew that the entirety of the discussion that day would not be devoted to negotiating the terms of the donation agreement. Kent had already been negotiating the terms of the donation agreement with Tyco for months without involving the Council, and his position was that the agreement was final and all that remained was for the Council to vote to approve it. This fact is demonstrated by Kent's response when Oitzinger asked about Marinette's added expenses and whether "Marinette should ask for more money [from Tyco] to cover those increased ongoing costs." Kent told Oitzinger "that they had finished negotiating and they believed this was the best deal they could get."

¶58 Instead, as Oitzinger suggested, at the October 6 meeting, the Council could have learned the background of the biosolids problem, learned the terms of the donation agreement, learned how the equipment worked, and they could have discussed Marinette's increased disposal costs all in open session. That information was not, or should not have been, secret. In fact, the citizens who were now dealing with serious concerns about PFAS in their water supply and the municipality's costs to clean them up at taxpayer cost had a right to know

this information. *See Buswell*, 301 Wis. 2d 178, ¶26 ("[T]he government must be accountable to the governed. It must be accountable to the people who underwrite government finances and provide its legitimacy. Having access to information about the workings of government undercuts arguments of subterfuge and ultimately promotes public trust and confidence."); WIS. STAT. § 19.81(1).

¶59     Further, the above information did not need to be kept secret from Tyco to protect Marinette's bargaining position. Kent had already negotiated this contract with Tyco on his own for four months. Tyco was aware of the PFAS problem, it was aware of the terms of the donation agreement because it participated in drafting the contract, and it would have been well aware that the PFAS problem was going to cost everyone a lot of money, now and in the future. Thus, Marinette was not in a position where it had "no other option" but to hold its entire discussion of the donation agreement in closed session. *See Milton*, 300 Wis. 2d 649, ¶14.

¶60     To further demonstrate the necessity of the result reached here, we must recognize what the members of the public who attended the October 6 meeting would have experienced. Without any discussion, the public would have seen the Council vote to convene in a closed session, while having no concept of what was to be discussed and why—other than what was contained in the notice. The Council would have then come out of closed session and immediately taken a vote on an unknown action item, with the public being told only that it was about biosolids equipment. Any member of the participating electorate would have felt confused and uninformed, which is in clear violation of the spirit, if not the letter, of the Open Meetings Law. *See* WIS. STAT. § 19.81(1).

¶61 Nevertheless, we are cognizant that the Council might have had concerns about public discussion of the donation agreement itself, given that the members had not previously seen a draft of that agreement. As Marinette argues, the Open Meetings Law "does not mandate clairvoyance." Under these circumstances, it would have been reasonable to anticipate that a counteroffer to Tyco and a negotiation strategy might have been on the table for discussion. However, as *Milton* held, "just because those concerns were present for portions [of] the meeting[] does not mean the entirety of the meeting[] fell within the narrow ex[em]ption under [WIS. STAT.] § 19.85(1)(e)." *See Milton*, 300 Wis. 2d 649, ¶19. The *possibility* that the Council would discuss a counteroffer or a negotiation strategy did not permit it to conduct the entire discussion of the donation agreement in closed session.

¶62 Instead, what should have occurred was a more detailed evaluation by the Council of the actual discussion rather than a blanket approach. The mayor could have given public notice of a *possible* closed session—meaning notice that the Council might go into closed session if a topic involving competitive or bargaining reasons arose during the open session. Simply because the mayor gave notice of a closed session, however, does not mean that the Council was *required* to convene in closed session. If the Council learned about the donation agreement, decided it was unhappy with it, and wanted to discuss further negotiations, it could have voted to convene in closed session to protect its competitive or bargaining interests.[18] If not, then the Council could have immediately moved for a vote on

---

[18] We recognize that the Council could not repeatedly come in and out of closed session unless proper notice of such action was given. *See* WIS. STAT. § 19.85(2).

(continued)

the donation agreement. Or, as the amici argued, the Council could have "set[] and follow[ed] an agenda." According to the amici, "[i]t does not require 'clairvoyance' to set aside time for a closed session for the limited purpose of discussing possible negotiation strategy after [Marinette] detailed the terms of a proposed agreement in open session."

¶63 Given our above examination, we conclude that the discussion of the donation agreement at the October 6 meeting was not required to be held entirely in closed session for competitive or bargaining reasons. Thus, Marinette violated the Open Meetings Law.

*III. October 7 meeting*

¶64 We next consider whether the circuit court properly granted summary judgment to Oitzinger and determined that the October 7 meeting did not require a closed session. The court reasoned that while it was "not unsympathetic

---

We also note that we find support for our interpretation in the Wisconsin Open Meetings Law Compliance Guide. There, when discussing the WIS. STAT. § 19.85(1)(f) exemption—which addresses financial, medical, social, or personal information about a specific person—the guide states the following:

> [Section 19.85(1)(f)] applies only where a member of a governmental body has actual knowledge of information that will have a substantial adverse effect on the person mentioned or involved. Moreover, the exemption authorizes closure only for the duration of the discussions about the information specified in … § 19.85(1)(f).

*See* WISCONSIN DEP'T. OF JUSTICE, WISCONSIN OPEN MEETINGS LAW COMPLIANCE GUIDE 28 (May 2024), https://www.doj.state.wi.us/sites/default/files/office-open-government/Resources/OML%20Guide_2024.pdf. The parties also cite various attorney general opinions discussing § 19.85(1)(e) for support, but we conclude that we need not rely on those opinions. *See City of Madison v. Town of Fitchburg*, 112 Wis. 2d 224, 237, 332 N.W.2d 782 (1983) ("[A]ttorney general opinions are not controlling precedent ….").

to [Marinette's] position," providing water to Peshtigo "was a potential problem for [Marinette] in the future, but there were no negotiations or bargaining position to protect at the time of the meeting." Based on our review of the circumstances surrounding the October 7 meeting, we agree and affirm the court's conclusion that Marinette violated the Open Meetings Law.

¶65 As discussed previously, the discussion at the October 7 meeting involved the well water in the neighboring Town of Peshtigo and R/M's independent review of the alternatives presented in the RAOR. This time, neither the mayor nor the Council had seen the R/M Memo prior to the October 7 meeting. The meeting notice stated generally that the Council would conduct a "discussion with legal counsel regarding the status of [the] water supply alternative analysis." Nevertheless, at the meeting, the Council again immediately voted to go into closed session without an understanding of what they would be discussing and why said discussion might be required to be held in closed session. The Council then conducted the entire discussion of the R/M Memo in that closed session and voted unanimously to adjourn the meeting without taking any further action.

¶66 As with the October 6 meeting, the Council violated the Open Meetings Law, first, by failing to hold any discussions on the record prior to voting to go into closed session. Again, the Council had no basis by which to determine that the information that Kent and R/M planned to provide involved competitive or bargaining interests such that a closed session was required to protect those interests. Regardless of what was actually discussed during the October 7 meeting, the Council was not provided sufficient information to assist it in making a proper determination under WIS. STAT. § 19.85(1)(e).

¶67   Second, Marinette violated the Open Meetings Law because there was no competitive or bargaining reason to enter into closed session. It is undisputed that there were no negotiations between Marinette and Peshtigo, and it is also undisputed that, at that time, Peshtigo had not even requested that Marinette provide water to some of its residents. Thus, there were no competitive or bargaining reasons present, let alone competitive or bargaining reasons that *required* a closed session. The record is clear that phase one of R/M's review was never meant to facilitate the Council making any decisions about providing water to Peshtigo.

¶68   Marinette argues, however, that circumstances surrounding Peshtigo's well-water concerns made the possibility of future negotiations more likely. For example, the DNR supported Marinette providing water to Peshtigo; members of a "PFAS advocacy group" and "steering committee" called SOH2O ("Save Our Water") had been voted onto Peshtigo's town board and the Council; newspaper articles indicated that Peshtigo wanted to open discussions with Marinette; Peshtigo's town board hired a law firm to address "legal matters pertaining to water contamination"; and Peshtigo's counsel sent Marinette a letter notifying it that Peshtigo was prepared "to begin discussion … regarding possible extension of City of Marinette water to certain residents of [Peshtigo]."[19]

¶69   Initially, we observe that speculation about the possibility of the need for future negotiations does not provide a basis to close a meeting within the bargaining exemption. For example, WIS. STAT. § 19.85(1)(g) states that meetings may be closed if a governmental body is "[c]onferring with legal counsel for the

---

[19] There is no evidence in the record that Marinette responded to Peshtigo's letter.

governmental body who is rendering oral or written advice concerning strategy to be adopted by the body with respect to litigation in which it is *or is likely* to become involved." (Emphasis added.) That paragraph recognizes that meetings could be closed for the purpose of discussing litigation that "is likely" to occur. Sec. 19.85(1)(g). Likewise, the bargaining exemption could have easily been written to include "current or future" competitive or bargaining interests, but it was not. *See Dawson v. Town of Jackson*, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316 ("We decline to read into the statute words the legislature did not see fit to write.").

¶70 Regardless, we disagree that the above facts established that negotiations were imminent or that Marinette, at this point, had a demonstrated competitive or bargaining interest to protect. Based on our review of the record, at the October 7 meeting, the Council heard a summary of the R/M Memo (the Council did not see the entire memo), and much of the information was already publicly available in the RAOR. R/M did not even make any recommendations as to what alternative would be the preferred option for Marinette. It was simply an information-gathering session.[20] The public deserved to know R/M's conclusions that Marinette had paid to obtain.

---

[20] Marinette asserts that during the meeting, Kent provided his legal opinion regarding each of the alternatives and whether they would expose the City to greater liability. According to Marinette, Kent also fielded questions from the Council "directly related to negotiations."

(continued)

¶71   In contrast, Oitzinger concurs with Marinette, and we agree, that if Marinette *had* decided to negotiate with Peshtigo to provide water, there would have been bargaining interests to protect. Like with the October 6 meeting, the Council should have heard Kent and R/M's presentation and asked the presenters questions in an open session. If, however, the Council determined that it wanted to discuss under what conditions it would offer water to Peshtigo, the Council could have then moved to go into closed session. It would have been appropriate to use closed sessions to protect those competitive or bargaining interests by developing its negotiation strategy—including acceptable terms, limits, or contingencies—secretly.

¶72   As Oitzinger observes, however, those were not the facts here. At most, at the time of the October 7 meeting, there was a theoretical possibility that negotiations might occur in the future. A theoretical possibility is not sufficient under *Milton*'s requirement that there be "no other option" but to hold a meeting in closed session. *See **Milton***, 300 Wis. 2d 649, ¶14.

### III. Attorney fees

¶73   The final issue is whether Oitzinger is entitled to his "actual and necessary costs of prosecution, including reasonable attorney fees" under WIS.

---

First, Marinette does not cite to the record for these propositions. Regardless, "[c]onferring with legal counsel for the governmental body who is rendering oral or written advice concerning strategy to be adopted by the body with respect to litigation in which it is or is likely to become involved" is addressed in WIS. STAT. § 19.85(1)(g), and Marinette affirmed that it was not relying on para. (1)(g) to support its position. Furthermore, as noted above, if the Council had wanted to move to hold specific discussions in closed session after explaining its basis for determining that the meeting involved information covered by one of the exemptions in § 19.85(1), it could have easily done so if the public was given notice of the possibility of a closed session. *See supra* ¶62; *see also **State ex rel. Citizens for Responsible Dev. v. City of Milton***, 2007 WI App 114, ¶9, 300 Wis. 2d 649, 731 N.W.2d 640.

STAT. § 19.97(4). Section 19.97(4) provides that in actions where a person brings a complaint under the Open Meetings Law on behalf of the state, "the court may award actual and necessary costs of prosecution, including reasonable attorney fees to the relator if he or she prevails, but any forfeiture recovered shall be paid to the state." In this case, the circuit court determined that it would not award Oitzinger any attorney fees or costs because it had issued a split decision. We review the court's decision on entitlement to attorney fees de novo. *See Friends of Frame Park*, 403 Wis. 2d 1, ¶12; *Sands v. Menard, Inc.*, 2013 WI App 47, ¶53, 347 Wis. 2d 446, 831 N.W.2d 805 (noting that whether a party qualifies as a "prevailing party" is a question of law).

¶74 On appeal, Oitzinger argues that the circuit court erred by applying an improper standard of law to its decision on attorney fees because it did not consider the *Hodge* standard. In *Hodge*, our supreme court addressed WIS. STAT. § 19.97(4) and determined that "a prevailing relator under the Open Meetings Law should be awarded attorney[] fees if an award would advance the purpose of the Open Meetings law: to ensure that the public has the fullest and most complete information possible regarding the affairs of government." *Hodge*, 180 Wis. 2d at 78-79. "If this condition is met, fees are awarded unless there is a showing of special circumstances which would render an award unjust." *Id.* at 79.

¶75 Marinette, for its part, conceded in its response brief that it "does not contest that, if Oitzinger prevails on this appeal or the cross-appeal, then he is a prevailing party entitled to attorney's fees"; however, Marinette did not believe that Oitzinger was the prevailing party as to either the October 6 or October 7 meeting. At best, Marinette fails to present an argument as to attorney fees under the circumstance where Oitzinger prevails in this appeal. *See Charolais Breeding*

*Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (arguments not refuted are deemed admitted).[21]

¶76    Given our determinations above that Oitzinger is the prevailing party in this appeal as to both the October 6 and 7 meetings, we conclude that we need not determine whether the circuit court erred by applying an improper standard of law.   We are to "decide cases on the narrowest possible grounds."   *State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997).   Because the case is no longer subject to a "split decision," we need not resolve the question of whether the fact of a split decision was a proper consideration under WIS. STAT. § 19.97(4) to determine whether Oitzinger is entitled to attorney fees.

¶77    Therefore, we remand this case to the circuit court with directions to determine Oitzinger's "actual and necessary costs of prosecution" in the circuit court, including attorney fees.   *See* WIS. STAT. § 19.97(4).   We further conclude that the court must include, in the determination of the award, reasonable attorney fees for the prosecution of this appeal.   *See, e.g.*, *Riley v. Isaacson*, 156 Wis. 2d 249, 261, 456 N.W.2d 619 (Ct. App. 1990) ("It is a widely recognized feature of fee-shifting statutes in general that, if a party prevails below and is entitled there to a reasonable attorney's fee, the entitlement extends to the fee reasonably incurred in defending the award on appeal."); *see also* *Shands v. Castrovinci*, 115 Wis. 2d 352, 359, 340 N.W.2d 506 (1983) (holding that, under WIS. STAT. § 100.20(5), "a tenant who has suffered pecuniary loss because of a violation of WIS. ADMIN.

---

[21]    At oral argument, Marinette's counsel appeared to partially walk back this concession by stating, "I'm not sure that we would go so far as acknowledging the briefing says if appellant wins outright, appellant gets fees," but counsel noted that "the briefing on this point was perhaps less than crystal clear."   Nevertheless, Marinette failed to provide any legal support or present a cogent argument for its position.   *See* *Pettit*, 171 Wis. 2d at 646-47.

CODE ch. [ATCP] 134 shall recover reasonable attorney fees for appellate review undertaken *to attack or defend a trial court's decision* in the suit" (emphasis added)).

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

Recommended for publication in the official reports.